140 So.2d 646

MOREHOUSE NATURAL GAS CO., Inc.

v.

LOUISIANA PUBLIC SERVICE
COMMISSION.

No. 45929.

April 30, 1962.

Jack P. F. Gremillion, Atty. Gen., Joseph H. Kavanaugh, Special Counsel, for defendant-appellant.

Benton & Moseley, Baton Rouge, for plaintiff-appellee.

HAMLIN, Justice.

The Louisiana Public Service Commission (hereinafter designated as the Commission) appeals from a judgment of the district court in favor of Morehouse Natural Gas Co., Inc. (hereinafter designated as Morehouse), which set aside Order No. 8406 of the Commission and authorized Morehouse to forthwith make effective the rate schedule proposed by Morehouse to the Commission in its original application filed before the Commission in these proceedings so as to allow a rate of return of 6% on a property rate basis of $186,790.00.

This controversy concerns itself with the property rate base of the Mer Rouge Gas Co., Inc. facilities purchased by Morehouse on January 21, 1960, under alleged unusual conditions to be hereinafter discussed.

Appellant contends that the order of the Commission, allowing a base of $44,076.00—purchase price, $20,000.00, additions during year, $14,076.00, 50% of purchase price, $10,000.00—is correct; appellee urges that the judgment of the district court establishing a property rate base of $186,790.00, estimated original cost less depreciation, is proper and should be affirmed.

Alleging that it provided service to approximately 875 customers in the Parishes of Ouachita and Morehouse, that it had been using the rates previously approved for Mer Rouge Gas Co. before its sale to Morehouse, and that the allowable 6% rate of return was deficient by $25,235.00, Morehouse petitioned the Commission for

an increase in the rates for natural gas to the following:[1]

"General Service Rate

| | | |
|---|---|---|
| "First 1,000 Cu. Ft. of Gas or Less | $2.00 Net | |
| "Next 2,000 Cu. Ft. of Gas | @ | 1.10 Per McF |
| "Next 37,000 Cu. Ft. of Gas | @ | 0.60 Per McF |
| "Over 40,000 Cu. Ft. of Gas | @ | 0.50 Per McF |
| "Minimum Monthly Bill | $2.00 | |
| "Meter Deposit | $10.00 | |

"Commercial Rate (Optional)
"All gas used @ 45¢ per McF

| | |
|---|---|
| "Minimum Monthly Bill | $25.00 |

"(Except Schools & Churches)

A hearing on the petition of Morehouse was held before the Commission on January 26, 1961. Mr. Simmons Barry, Secretary-Treasurer of Morehouse, testified on behalf of his company; he stated that he owned 50% of the company, but that his opinions were those of a utility engineer, the profession he practiced. He said that a total of $30,000.00 [2] was paid for the Mer Rouge facilities and that his company "got a first-class bargain in paying only $30,000.00 for this property." Mr. Barry stated that United Carbon Co. owned all of the stock of Mer Rouge Gas Company, and "there was a very good reason for the former owner to dispose of these properties. Now, it was faced with a double-barrel situation where he could get hit on one side or the other, first, it was the supplier of the gas for the system; it produced and supplied its own gas and sold it at retail. It is a very large company (I am speaking of United Carbon) wherein they were threatened with the possibility of being put under the control of the Federal Power Commission due to the fact that they sold very small quantities of gas at retail, which, in their operations, would have been a very bad situation. The basis for that small figure in that particular case was to get out of that situation and they got out of it immediately, as soon as they could find someone who was willing to take it over."

Mr. Barry testified that in order to receive a 6% rate return, make necessary improvements and replacements, and provide adequate service, it was necessary that Morehouse have a property rate base of $186,790.00; he testified in detail with respect to Plaintiff's Exhibit No. 3, "Estimated Cost of Gas System," which reflects a total cost to the former owner of $233,-488.00 and an "Estimated Depreciated Val-

1. The present rates are:

| | | |
|---|---|---|
| "Residential | 1,000 cu. ft. | .60¢—5% discount if paid before 10th of month |
| "Churches | 1,000 cu. ft. | .50¢—5% discount if paid before 10th of month |
| "Municipal & school | 1,000 cu. ft. | .25¢ |
| "Industrial | 1,000 cu. ft. | .25¢ |
| "Cleaning and pressing shops | 1,000 cu. ft. | .25¢—Min. $15.00 |
| "Cotton Gin service | 1,000 cu. ft. | .30¢—Min. $10.00 |

2. In briefs and in the Commission Order, it is stated that the purchase price was $20,000.00. Mr. Barry stated that at the time the system was purchased, United Carbon gave his company an estimated quantity of pipe.

ue of System" of $186,790.00.[3] In explaining that the actual cost to the former owner was unknown, Mr. Barry said:

"Now, these figures were arrived at by the preparation of complete drawings, copies of which have been submitted to the Public Service Commission, showing all the physical property of the Company, totalizing the various sizes of pipe and items of equipment such as feeders, casing, regulator stations, service assemblies, applying to that an estimated original cost, then of summing up the total and taking an automatic decrease in valuation which would be charged off as depreciated item and arriving at an estimated depreciated value of the system as it presently exists.

"Now, the unit costs which were applied are reasonable in our opinion, reasonable figures, and the quantities are exact quantities which are the measured quantities, and the depreciated value is based on 80% of the estimated original cost which is, I

3.

"EXHIBIT NO. 3

"MOREHOUSE NATURAL GAS COMPANY, INC.
"ESTIMATED COST OF GAS SYSTEM

| "QUANTITY | ITEM | UNIT COST | EXTENSION |
|---|---|---|---|
| 400 LF | 6" Steel Pipe | $ 3.20 | $ 1,280 |
| 40,154 LF | 4" Steel Pipe | 1.80 | 72,277 |
| 3,842 LF | 3" Steel Pipe | 1.30 | 4,995 |
| 35,167 LF | 2" Steel Pipe | 0.90 | 31,650 |
| 19,981 LF | 1½" & 1¼" Steel Pipe | 0.80 | 15.985 |
| 76,936 LF | 1" & ¾" Steel Pipe | 0.70 | 53,855 |
| 875 EA | Service Assemblies | 50.00 | 43,750 |
| 9 EA | 4" Valves | 67.00 | 603 |
| 1 EA | 3" Valves | 48.00 | 48 |
| 5 EA | 2" Valves | 36.00 | 180 |
| 9 EA | 1½" & 1¼" Valves | 25.00 | 225 |
| 11 EA | 1" ¾" Valves | 20.00 | 220 |
| 270 LF | Jack or Bore 4" Pipe | 2.50 | 675 |
| 30 LF | Jack or Bore 3" Pipe | 2.00 | 60 |
| 1,080 LF | Jack or Bore 2" Pipe | 1.50 | 1,620 |
| 540 LF | Jack or Bore 1½" & 1¼" Pipe | 1.00 | 540 |
| 1,353 LF | Jack or Bore 1" & ¾" Pipe | 0.75 | 1,015 |
| 300 LF | 6" Vented Steel Casing | 6.00 | 1,800 |
| 90 LF | 4" Vented Steel Casing | 4.00 | 360 |
| 1 EA | Tap Station & Odorizer | | 950 |
| 1 EA | Mer Rouge Regulator Station | | 1,400 |

TOTAL $233,488"

"ESTIMATED DEPRECIATED VALUE OF SYSTEM $186,790"

think, an accepted method of estimating the valuation of a system where the figures are unknown. Actually, there are no figures available which show this and which are available to us, nor were we able to obtain these figures from the previous owner."

Mr. Barry's uncorroborated testimony was a plea to the Commission to consider the proposed rates as a sound business proposition under increased costs and increased assessments. He admitted that the average annual cost to the consumer would change from $59.00 to $87.00; he also admitted that there would be an increase in minimum payments of $4.20 versus $2.00.

The testimony of one protestant to the increased rates was scant and not technical.

On May 9, 1961, the Commission issued Order No. 8406, which recites in part:

"The applicant claims that it is entitled to a return of 6% on the estimated original cost of the plant in service, which is shown in Exhibit 3 in the amount of $233,488 with a depreciated value of $186,790, and on that basis it is claimed that the deficiency in revenue is $25,235 annually.

"The petition in this matter was filed in August, 1960, and since the present owners acquired the property in February, 1960, there was but six months

of actual operations included in the operating statement that was attached to the company's petition and designated as Exhibit 2. The twelve months operations as shown therein are, therefore, based on estimates.

"Since a full year has now elapsed from the date of acquisition, the Commission has asked its accounting staff to prepare a statement of earnings based on actual operations for twelve months ended January 31, 1961, adjusted for known changes and taking into consideration the sales to the present customers including those that have been added during the past year. This has been done and the operating loss thus determined is $1,861.59.

"We do not agree with the applicant that it is entitled to a return on a rate base of $186,790. Reliable testimony shows that the purchase price was $20,-000 and we think that the large difference between the purchase price and the estimated original cost should be carefully considered. We are convinced that the present owners bought a 'bargain' and we are willing to consider that fact and base our findings in the matter on the purchase price plus 50%, plus the actual cost of additions since the date of acquisition. Thus the rate base that we shall use is as follows:

"Purchase price $20,000
"Additions during year 14,076
"50% of purchase price 10,000
$44,076

"Since this is a closely held corporation and since the stock is not traded on the market, we will deviate from our established practice of basing a rate of return on the cost of money and will allow a rate of 6% on the above amount of $44,076. This will amount to $2,645. The indicated loss from operations is $1,862 and thus the amount of increase necessary is $4,507. The income tax will amount to $1,134 on a net return after tax of $2,645 and thus the additional gross revenue needed to result in a return of 6% on the above mentioned rate base is $4,507 plus $1,134 or $5,641 and that amount of increased revenues will be authorized.

"IT IS ACCORDINGLY ORDERED, that:

"1. The proposed rates as set forth in Exhibit 4 attached to applicant's petition be and they hereby are denied.

"2. New tariffs of rates shall be submitted for this Commission's approval that will result in additional gross revenues of $5,641 annually."

In annulling and setting aside the Order of the Commission, the trial court found that:

"* * * the principle or method uniformly and consistently followed by the Commission in establishing the rate base of a public utility is to make this calculation on the basis of the cost to the investor who first placed the utility in operation, less depreciation, and without regard to any actual purchase price which may have been involved in subsequent sales of the utility. This principle is true as it has been applied by the Commission whether the purchase price in the subsequent sale is greater or less than the original cost less depreciation.

*    *    *    *    *    *

"* * * The only witness who testified at the hearing was Mr. Simmons J. Barry, Secretary-Treasurer of Morehouse. (Mr. Gayle Carter was sworn as a witness and made a few comments in the nature of argument). Mr. Barry is a utility engineer by profession, as was recognized during the course of the hearing by Commissioner Knight, * * *

"* * * the Court attaches considerable importance to the fact that the bases for Mr. Barry's calculations were well known to Mr. S. I. Nicholls, Director of the Utility Division of the Public Service Commission, and, also, apparently well advised as to matters related to rule-making,

and to other staff members of the Commission, and no effort was made whatever to refute Mr. Barry's estimates. Under these circumstances, the Court accepts these calculations as the bases of the findings for the conclusions to be herein arrived at, applying to these facts the controlling principles of law.

"If this Court is to attach any weight to prudent investment and to the legal and equitable principles which would seem to govern this case, it becomes at once unreasonable upon the face of the figures to require Morehouse to own and operate a public utility involving more than eight hundred customers, located in a rural section of the State, in two parishes, for a net profit of twenty-five cents per month per customer.

\*     \*     \*     \*     \*     \*

"There is no doubt but that this Court must give considerable weight to the rulings of the Commission, as under the law the Commission is vested with a considerable latitude of discretion in ratemaking. The Court has the authority and the legal duty, however, to change the rulings of the Commission where the action of the Commission is arbitrary and discriminatory and is unsupported by the facts, and the Court believes such to be the case here.

"This conclusion is not only based upon the unrefuted testimony of Mr. Barry to which considerable weight must be given since it was not disputed by the technical men of the Commission staff where plainly it might have been if there is error in it, but furthermore, the Court cannot ignore the Commission-approved prevailing rural rate in the same area."

In this Court, the Commission sets forth the following Specification of Errors:

"The Honorable Trial Judge of the Nineteenth Judicial District Court erred:

"(1) In concluding that the rates fixed by the Louisiana Public Service Commission were discriminatory, unjust, and unreasonable;

"(2) In concluding that the Louisiana Public Service Commission is required to use the 'prudent investment' theory in establishing a rate base;

"(3) In concluding that the rate base should necessarily be established by taking into account the original cost to the first investor offering the public service less depreciation;

"(4) In failing to apply the principles as announced by this Honorable Court in Southern Bell Tel. & Tel. Co. vs. Louisiana Public Service

Commission, 187 La. 138, 174 So. 180;

"(5) In substituting its judgment for that of the Commission when the judgment of the Commission is not arbitrary nor capricious nor contrary to the evidence, and no error of law has been committed;

"(6) In concluding that plaintiff-appellee is entitled to a six per cent (6%) rate of return."

"A 'public utility' has been described as a business organization which regularly supplies the public with some commodity or service, such as electricity, gas, water, transportation, or telephone or telegraph service. While the term has not been exactly defined, and, as has been said, it would be difficult to construct a definition that would fit every conceivable case, the distinguishing characteristic of a public utility is the devotion of private property by the owner or person in control thereof to such a use that the public generally, or that part of the public which has been served and has accepted the service, has the right to demand that the use or service, as long as it is continued, shall be conducted with reasonable efficiency and under proper charges. * * *" 73 C.J.S. Public Utilities § 1, p. 990. "A public utility has the duty to supply a commodity or to furnish service to the public. This duty exists independently of statutes reg-ulating the manner in which it shall do business or of contracts with municipalities or individuals, and is imposed because the utility is organized to do business affected with a public interest and holds itself out to the public as being willing to serve all members thereof. Broadly speaking, the primary duty of a public utility is to give reasonable and adequate service at reasonable rates and without delay." 73 C.J.S. Public Utilities § 7, p. 998.

In their service to the public, "Public Utilities" are usually regulated by some type of "Public Utility Commission." "Public utility commissions are created for the accomplishment of public purposes. They are created for the purpose of exercising regulatory police power over public utilities, and to compel the performance by utilities of their public duties, and are intended to safeguard the interests of the utilities and of the public. However, they are not intended primarily for the benefit of established utilities; their primary purpose is to serve the interests of the public. They represent the public, and are for the benefit of the state and its citizens. * * *" 73 C.J.S. Public Utilities § 32, p. 1054.

In Louisiana, the Louisiana Public Service Commission is a constitutionally created body. Article VI, Section 3, Louisiana Constitution of 1921, LSA. See, also, LSA–R.S. 45:1161 et seq. The power to

regulate public utilities is set forth in Article VI, Section 4, of the Constitution. LSA–R.S. 45:1161 defines a "Public Utility," and states that it is subject to the general jurisdiction of the Commission.

"* * * The law is not made for the protection of experts, but for the public—that vast multitude which includes the ignorant, the unthinking and the credulous, who, in making purchases, do not stop to analyze, but are governed by appearances and general impressions. * * *" Florence Mfg. Co. v. J. C. Dowd & Co., 2 Cir., 178 F. 73, 75; Charles of the Ritz Distributors Corp. v. Federal Trade Commission, 2 Cir., 143 F.2d 676. See, Feil v. F. T. C., 9 Cir., 285 F.2d 879.

We are herein concerned with a "Public Utility" which furnishes its services—supplying gas—to the public, and a "Public Utility Commission" which was constitutionally created for a public service and for the protection of the public and utility companies.

In the case of Southern Bell Telephone and Telegraph Company v. Louisiana Public Service Commission, 232 La. 446, 94 So.2d 431, 438, we held that there is no prescribed formula for the fixing of "reasonable and just" rates; that it is *the result* reached, not the method employed, which is controlling. We followed the theory set forth in Federal Power Commission v. Hope Natural Gas Company, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333, to the effect that the fixing of "just and reasonable" rates involves a balancing of the investor and the consumer interests.

■ Therefore, in establishing a property rate base herein, it was not necessary that the Commission follow a particular formula, nor was it violative of any law for it to abandon value theories previously followed by it. However, it is incumbent upon the Commission that in the protection of the public and the instant utility company, its result be neither unjust nor unreasonable.

All parties litigant admit that Morehouse purchased the facilities of Mer Rouge at a bargain. Plaintiff is not as large a company as its vendor, whose rates it temporarily adopted; it adduced evidence to the effect that it had been operating at a loss from the time of purchase to the time of trial. Plaintiff also adduced evidence to the effect that the costs of replacement and the expenses of upkeep were not those of an inferior facility or system; that such costs were those of the present day.

■ In view of the above, we agree with the finding of the trial judge that the Commission's method of arriving at a correct property rate base was arbitrary and discriminatory; it neither made nor or-

dered an independent appraisal of the facilities purchased by plaintiff. The conceded bargain price in the instant matter does not represent true value; the fifty per cent allowance ($10,000.00) is unexplained, and there is no proof that its addition to the purchase price brought the bargain price up to a reasonable value. The action of the Commission was an exercise of discretionary authority unsupported by evidence, and under the circumstances it can be disturbed. Gulf States Utilities Co. v. Louisiana Public Service Commission, 222 La. 132, 62 So.2d 250.

Mr. Barry's testimony, which was accepted by the trial judge, was uncorroborated. Mr. Barry admitted that his appraisals were estimated; he was sincere in the valuations which he placed on the various items of the inventory, but, such valuations were unsupported by evidence.

The record in this appeal is neither adequate nor sufficient to enable the determination of a proper property rate base. The differential between $186,790.00 and $44,076.00 is startling and gives rise to concern. We are, therefore, constrained to remand this case to the Commission in order that it shall appoint an independent, unbiased appraiser to make an appraisal of the system purchased by plaintiff. The expense of such appraisal shall be assessed at the discretion of the Commission.[4]

The Commission and Morehouse shall have the right to contest the accuracy of the appraisal. After a full and complete consideration of the testimony adduced with respect to the appraisal, costs of replacement, expenses of upkeep, and other pertinent subjects, the Commission may then determine what in its opinion is an applicable property rate base.

For the reasons assigned, the judgment of the district court is reversed and set aside, and the case is remanded to the Louisiana Public Service Commission for further proceedings in accordance with law and consistent with the views herein expressed. All costs are to await the final disposition of the case.

HAWTHORNE, J., concurs in the decree.

SANDERS, J., concurs in the decree with written reasons.

4. "Whenever the commission makes an examination of the affairs of any person doing a public service or public utilities business in Louisiana for the purpose of fixing and regulating the rates charged or to be charged or services to be rendered by such public service or public utility business all expenses incurred by the commission in conducting such examination, including the expenses and fees of engineers, consultants, accountants or clerical assistants specially employed to make the examination, shall, at the discretion of the commission, be paid by the person so examined." LSA–R.S. 45:1180.

SANDERS, Justice (concurring).

I concur in the remand of this case to the Louisiana Public Service Commission for further proceedings.

The wide differential between the original cost and acquisition price of the property devoted to public service has produced a serious rate problem requiring the fullest study and consideration. In 1946 the Louisiana Public Service Commission abandoned the "fair value" theory and adopted the "prudent investment" theory for rate-making purposes. See Louisiana Public Service Commission v. Louisiana Power and Light Company, 65 PUR (NS) 18. At the same time the Commission adopted as the starting point for rate base determination the original cost of the property in useful service. This required the ascertainment of the cost of the property at the time it was first devoted to public use. However, provision was made for an account designated as "Utility Plant Acquisition Adjustments." This account was designed for the consideration of acquisition costs *in excess* of original cost in the rate-making process. See Louisiana Public Service Commission v. Louisiana Power and Light Company, supra. The instant case involves a differential arising from an acquisition price *less* than the original cost. The differential presents both an accounting and a disposition problem for rate purposes. See Bonbright,

Principles of Public Utility Rates, p. 176 (1961). In my opinion the present record is inadequate to properly resolve the issue raised by the appeal.

For the reasons assigned, I respectfully concur in the decree.