McCALEB, Justice.
This is a suit for a declaratory judgment instituted by Greater Baton Rouge Port Commission seeking adjudication of certain alleged rights under a lease it granted to Cargill, Incorporated. On September 7, 1955 the Port Commission leased to Cargill land in West Baton Rouge Parish, including a grain elevator and wharf for a *721 primary term of twenty 3'cars. The contract provides in the third clause or paragraph of Article 17:
“During the term of this lease Cargill shall have the exclusive right to operate hereunder a public grain elevator within the Port Area as such area is defined by law. In the event said grain elevator is inadequate to properly handle the then existing grain movement through the Port Area and the Port decides to construct additional grain storage and handling facilities, Port must first offer such facilities to Cargill for operation on such terms and for such payments as the Port is prepared to make to responsible third persons in good faith. Cargill must accept or reject such an offer within thirty (30) days; failure by Cargill to notify Port in writing of its election within said thirty (30) day period shall be deemed to be a rejection of said offer. Any modified offer by Port must similarly be first submitted to Cargill and rejected by Cargill before being submitted to third persons.”
Article 16 of the lease required the cost of the leased premises and any improvement thereon be financed through the issuance by the Port Commission of general obligation bonds in accordance with the provisions of Article VI, Section 29 of the Louisiana Constitution.[1] Conformably with this constitutional plan, the grain elevator erected on the leased premises and operated by Cargill, was financed from portions of the proceeds of issues of general obligation bonds sold by plaintiff, and the revenues from any of the plaintiff’s operations are likewise pledged as security for the payment of its bonds and notes. About ten years after the 1955 lease had been in effect, while Cargill was operating the only public grain elevator within the Port Area under the contract, a dispute arose between the parties respecting their rights, liabilities and duties under Article 17 of the lease. The Port Commission, having received inquiries from third parties with respect to leasing of property either owned or under control of the Port Commission within the Port Area, conceived that it was free, despite the language of Article 17 of the contract, to lease such land to third persons for the purpose of erecting thereon by such third persons another grain elevator or elevators. Cargill denied that the Port Commission had any such right, maintaining that it was. *723 vested under Article 17 with the exclusive privilege of operating a public grain elevator within the Port Area. Hence, this litigation in which the Port Commission 'asserts, primarily, that the lease does not extend to Cargill an exclusive privilege but that Cargill is vested only with the right of first refusal to lease from the Port Commission any additional grain storage and handling facilities which it, the Port Commission, might elect to construct within the Port Area in the event the present grain elevator operated by Cargill is found to be inadequate to properly handle the existing grain movement through the Port Area.
Alternatively, the Commission claims that neither it nor any other public authority is vested with power to grant exclusive franchises, privileges or monopolies for the operation of grain elevators.
In its answer, Cargill denies the contentions of the Port Commission and, assuming the position of plaintiff in reconvention, asserts that the language of Article 17 of the lease is clear and unambiguous; that it vests in Cargill the exclusive right to operate a public grain elevator' within the Port Area of the Port Commission which is subject only to the right of first refusal, under the conditions set forth in the sentence immediately following the grant of the exclusive right, and that this grant is valid and binding on the Port Commission.
Accordingly, Cargill seeks a declaration that it “has the exclusive right to operate a grain elevator within the port area * * * and that the Port Commission may not authorize or permit the operation of a public grain elevator within the area subject to its jurisdiction unless and until the facilities leased to Cargill are inadequate to properly handle grain movement through the Port Area and Cargill has failed to exercise its right of first refusal to lease additional facilities to be constructed by Port Commission.”
After trial in the district court on the issues thus formed by the pleadings, the judge sustained the position of the Port Commission, dismissed Cargill’s reconventional demand, and decreed: (1) that the 1955 lease did not vest in Cargill the exclusive right to operate a public grain elevator within the Port Area; (2) that the Port Commission has never had the legal or constitutional authority to grant an exclusive franchise or privilege to operate a public grain elevator within the Port Area; and (3) that the 1955 lease does not prohibit the Port Commission from leasing, or making available to any third party, land owned or otherwise controlled by it within the Port Area for the establishment and operation thereon of a public grain elevator or elevators by such third party.
Thereafter Cargill appealed to the Court of Appeal, First Circuit, where the judgment of the district court was amended and affirmed. See Greater Baton Rouge Port Comm. v. Cargill, Inc., La. 205 So.2d 151. *725 The Court of Appeal upheld the trial judge’s ruling that the lease agreement does not vest Cargill with the exclusive right to operate a grain elevator within the Port Area. However, it declared that the lease does grant to Cargill the first right of refusal to operate any other grain elevator on property controlled by the Port Commission, if the present facilities become inadequate and should the Port Commission decide to construct additional facilities for the handling of grain. And the court further declared that the 1955 lease agreement does not prohibit the Port Commission from leasing, or otherwise making available to any third party, land owned or controlled by plaintiff within the Port Area for the establishment or operation thereon by any such third party of a public grain elevator or elevators, except that Cargill shall have the first right of refusal on any such land offered for such purposes.
Both Cargill and the Port Commission applied to the Court of Appeal for a rehearing. The applications were refused and Cargill, in due course, sought certiorari. The writ was granted and the case has been argued and submitted for our decision.
We think the declarations below erroneous. In the first place, the lease agreement, considered as a whole in connection with the specific provisions of Article 17 thereof, manifests beyond peradventure that Cargill has been given the exclusive right to operate a public grain elevator within the Port Area of the Greater Baton Rouge Port Commission and is also granted the option to protect this exclusive right in the event the grain elevator should (during the term of the lease) become inadequate to properly handle the then existing grain movement through the Port Area, and the Port Commission decides “to construct additional grain storage and handling facilities * * * ”. The grant of the exclusive privilege to Cargill is stated in clear and unmistakable terms in the first sentence of Article 17, for it declares: “During the term of this lease Cargill shall have the exclusive right to operate hereunder a public grain elevator within the Port Area as such area is defined by law.” (Italics ours.)
However, counsel for the Port Commission would have us hold that the exclusive grant is not an exclusive grant extending to the operation of a grain elevator within the Port Area but only to this grain elevator covered by the lease. And, in their effort to justify this position, they point to the word “hereunder” which appears in the first sentence of Article 17 (quoted immediately above) and declare “it was thus the intention of the parties, * * * to restrict (by the use of the word ‘hereunder’) such rights as Cargill might have under paragraph 17 of the lease agreement to that of first option and refusal on any such additional grain facilities as might be constructed by the Commission.”
*727 This postulation is fallacious. The word “hereunder” merely connotes that the exclusive right “under this lease” is granted to Cargill to operate a public grain elevator in the Port Area; it does not in anywise evidence an intent of the parties to restrict the scope of the exclusive right to the area of the operations conducted on the leased premises. The only limitation on the exclusive right (and this is an unexpressed limitation) is that the Commission does not have the authority to prohibit a private owner of land situated within the confines of the Port Area from building a private grain elevator on his own premises as held by the Court of Appeal, Second Circuit, in Lake Providence Port Comm. v. Bunge Corp., La., 193 So.2d 363, certiorari denied with approval (see 250 La. 269, 195 So.2d 147). To say, however, that by the use of the word “hereunder” or “under this lease” the parties intended that Cargill would have only the exclusive right to operate the facilities leased by the Commission is to deduce that the agreement does not in fact grant an exclusive right to operate a grain elevator in the Port Area and, hence, there was no reason for the inclusion of such right in the contract. Such a construction cannot be sustained because Cargill was entitled by law, without express provision of the contract, to the exclusive posession, use and occupancy of all the facilities leased by the Port Commission.
The law primarily applicable to this case is Article 1945 of the Civil Code providing that “Legal agreements having the effects of law upon the parties, none but the parties can abrogate or modify them.” Upon this principle, the rule is established “That courts are bound to give legal effect to all such contracts according to the true intent of all the parties;” and “That the intent is to be determined by the words of the contract, when these are clear and explicit and lead to no absurd consequences.” As heretofore stated, we think it self-evident that the language of the contract makes plain that the parties thereto, at the time of the confection of the contract,[2] intended and expressly provided that Cargill was to have the exclusive right to operate a public grain elevator within the Port Area and that, in case the grain elevator (which was built by the Port Commission specially for this purpose) became inadequate and the Commission decided to construct an additional grain elevator, it was required to offer Cargill such additional facilities on such terms and for such payments as the Commission was prepared to make to responsible third persons in good faith.
*729 Albeit we could perforce rest our decision on the provisions of the contract alone, in which the parties have clearly expressed their intent, we find it unnecessary to do so for, if it be generously assumed that some ambiguity exists with respect to the correct interpretation of Article 17 of the lease, a consideration of its other provisions and the construction given it by the parties leaves no room for doubt that the Port Commission intended, at the time it entered into this lease contract in 1955, to grant an exclusive franchise to Cargill to operate a public grain elevator within the Port Area. This is made manifest by the deposition of Mr. Ernest D. Wilson, which was taken on behalf of Cargill.
Mr. Wilson served as President of the Greater Baton Rouge Port Commission from 1952 to 1965. He testified that he was active in negotiating the lease between the Port Commission and Cargill. At that time (1955), the Port Commission had no facilities whatsoever in the area and the Commission contacted Cargill in Minneapolis and sold it the idea of the grain elevator. The reason given by Mr. Wilson as to why the Commission was anxious to get Cargill in Baton Rouge to operate a grain elevator is as follows:
“That was the base of our whole planning in the Port. Cargill is one of the world’s largest handlers of grain. We recognized it and we built the elevator at Baton Rouge according to plans which were approved by Cargill. Because of Cargill’s position as an international grain merchant, business would naturally flow into the Port.”
Mr. Wilson testified that during the negotiations with Cargill there was discussion as to whether Cargill would have exclusive rights in the Port Area. The outcome of this discussion was that provisions were placed in the lease agreement to that effect. These were incorporated in Article 17 of the lease. The intention, in Mr. Wilson’s words, was “Simply that Cargill has the exclusive privilege within the Port area on the Port property.” It was Mr. Wilson’s interpretation, as President of the Commission, that the lease gave Cargill first preference on any elevator constructed on port property, whether financed by the port or otherwise, emphasis being placed on property owned by the Port, and not on elevators built by the Port.
According to Mr. Wilson, the only question raised as to the provisions of this lease was some years ago when the Port Commission was in contact with another grain company. The matter was discussed with Mr. McMillan, then President of Cargill, because of the provisions in the lease. Up until the present time, Mr. Wilson stated, these provisions have never been questioned.
Moreover, apart from the deposition of Mr. Wilson, other provisions of the contract exhibit the benefit the Port of Greater *731 Baton Rouge lias derived under the exclusive grant it has conferred on Cargill. For example, under Article 10 of the lease, it is provided that the grain elevator and wharf shall be maintained as public port facilities and that Cargill’s rates shall be on a competitive basis with published rates at New Orleans and other Gulf ports. Article 10 also declares:
“Cargill further agrees to the extent economically feasible that it will give preference to this grain elevator over other grain elevators operated by Cargill in the Gulf area.”
This clause, as well as Article 17 of the lease agreement, was considered by the United States Court of Appeal, Fifth Circuit, in Greater Baton Rouge Port Commission v. United States, 287 F.2d 86 (1961), wherein the Port Commission and Cargill were co-petitioners in an effort to have the federal court hold that the operations in the Greater Baton Rouge Port Area, particularly an amendment to the lease here questioned in which the Commission granted to Cargill the exclusive right to control the stevedoring in the Port Area, was outside the jurisdiction of the Federal Maritime Board acting under the Shipping Act, 46 U.S.C.A., Section 801, et seq. The court, in rejecting the contention of the petitioners, aptly observed:
“Cargill, Inc. is a large grainhandling company. It has an exclusive right to operate a public grain elevator within the Greater Baton Rouge port area by virtue of an agreement with the Baton Rouge Port Commission.”
And, after quoting from Article 10 and Article 17 of the lease in question, the court stated :
“The provisions for (1) the preference to the Baton Rouge elevator over other elevators in the Gulf area, (2) the regulation of rates (required to be competitive with other Gulf ports), (3) Cargill’s exclusive right to operate a grain terminal, and (4) Cargill’s first refusal on any additional terminals, take the agreement out of the ambit of ordinary leases and place it squarely within the terms of Section 15. This is no ordinary grain elevator. It is operated at a port. Its function is to facilitate the loading and unloading of grain for vessels using the port because of its handling and storage services. It is part and parcel of an over-all scheme for the greater commercial development and use of the Baton Rouge port area. An agreement pertaining to the exclusive operation of such an elevator, dealing with preferences and rates, maritime services and facilities, has such a significant maritime connection as to fall well within the jurisdiction and scope of authority of the Federal Maritime Board.” (Italics by the court.)
Accordingly, it is evident that this lease, until the comparatively recent efforts of the Port Commission to dispose of some of *733 the property in the Port Area to a third person or persons for the construction and operation of a public grain elevator in competition with Cargill, has always been considered, pursuant to the terms of the contract, as an exclusive grant to Cargill to operate a public grain elevator within the Port Area.
In these circumstances, Cargill is entitled to judgment on its reconventional demand unless, as the Port Commission alternatively contends, it was without legal authority to grant an exclusive privilege for the operation of grain facilities in the Port Area. On this point, it is argued by the counsel for the Port Commission that the law is well settled that a public body has no power to grant an exclusive franchise to private corporations, unless such power has been delegated to it either expressly or by necessary implication under the legislative act. And counsel cite, under this well-established rule, New Orleans City & Lake R. Company v. City of New Orleans, 44 La.Ann. 728, 11 So. 78; McQuillin Municipal Corporations, Vol. 12, Section 34.23, p. 81; and 58 C.J.S. Monopolies § 4, p. 958.
In this case, however, the power of the Port Commission to grant the exclusive privilege, conferred on Cargill under the lease, has been delegated to it by necessary implication, if not expressly, under the constitutional provision creating the Greater Baton Rouge Port Commission. For Section 29 of Article VI of the Constitution, in providing the authority for the Commission to enter into contracts and leases, declares:
“The Commission shall have authority to make and enter into contracts, leases and other agreements with railroads, trucking companies, barge lines and with any and all companies interested in the transportation; storage and shipping of goods and other products, whether by rail, truck line, barge line, ocean going vessels or otherzvise for the use of facilities administered by the Commission or any part of portion thereof, for a period of time not exceeding forty (40) years. No exclusive franchise, however, shall be granted to any carrier.” (Italics o nrs)
In this case, the Court of Appeal properly held that Cargill was not a carrier insofar as the operation of the grain elevator was concerned. It was found that Cargill owns a barge line and that thirty percent of the grain unloaded at Cargill’s many grain facilities is from this subsidiary barge company. We agree with the Court of Appeal’s conclusion on this point since the exclusive right granted by the lease is not for the benefit of the barge line but only for the operation of the grain elevator.
Nor do we perceive merit in counsel’s argument that the constitutional provision *735 does not vest in the Commission the power to grant an exclusive privilege to operate a grain elevator. The aboye quoted constitutional grant of power vested in the Commission to enter into contracts, leases and other agreements necessarily includes by implication the authority to grant exclusive privileges in order to carry out the scheme for the development of the Port of Baton Rouge. Indeed, this is made evident by the last sentence of the provision declaring: “No exclusive franchise, however, shall be granted to any carrier.” This language, containing as it does an affirmative pregnant, indicates the intent of the lawmakers that in all other instances, save those involving contracts with carriers, the Port Commission has authority to grant exclusive franchises, rights or privileges.
For the reasons assigned the judgment of the District Court, as amended and affirmed by the. Court of Appeal, is annulled and set aside, and it is now ordered that there be judgment in favor of Cargill, Incorporated, on its reconventional demand, declaring that Cargill has the exclusive right to operate a public grain elevator within the Port Area of the Port Commission, and that the Port Commission may not authorize or permit the operation of a public grain elevator on other lands owned by it, or subject to its control, within the Port Area, unless and until the facilities leased to Cargill are inadequate to properly handle the grain movement through the Port Area and Cargill has failed to exercise its right of first refusal to lease any additional facilities constructed by the Port Commission, as provided by Article 17 of the lease. The Port Commission is cast for all costs legally assessable against it under the law.

. This section, adopted in 1952 as an addition to Article VI of our Constitution, created the Port Commission and gave it jurisdiction of the Port Area, which consisted of the Parishes of East and West Baton Rouge and Iberville, excepting therefrom certain industrial areas within East Baton Rouge parish. The Port Commission is a state agency empowered to promote and otherwise develop the commerce of the Port Area and, to this end, it is authorized to erect various harbor facilities, issue bonds and lease such properties to industrial and shipping concerns for periods not exceeding forty years.

. As stated in New Orleans Terminal Co. v. Dixie Rendering, Inc., La.App. 179 So. 98: “It is well settled that the intention of the parties to a contract is to be gathered, not from a single sentence or word, but. from the whole instrument read in the light of circumstances existing at the time of negotiations leading to its execution. See Miller v. Robertson, 266 U.S. 243, 45 S.Ct. 73, 69 L.Ed. 265.”