JaLOTTINGER, Chief Judge.
In this action, various towing companies seek to enjoin the port commission and the lessee of its terminal from requiring ships calling at the terminal to utilize in-house tugboat services provided by a competitor. Following the district court’s denial of their request for preliminary and permanent injunctions, the towing companies have appealed.
FACTS
The Greater Baton Rouge Port Commission (hereinafter, “Port Commission”), a named defendant herein, owns a bulk cargo terminal situated on the east bank of the Mississippi River at Burnside, Louisiana. The Burnside terminal was constructed in the late 1950’s by Olin Matheson Chemical Corporation (hereinafter, “Olin Matheson”). Upon its completion, Olin Matheson sold the terminal to the Port Commission which financed its acquisition through the issuance of general obligation bonds. Following its purchase of the Burnside terminal, the Port Commission leased this facility to Olin Matheson for use in connection with its adjacent plant facility.
The Burnside terminal is a public marine terminal designed to assist shippers of bulk cargo in the loading and off-loading of their goods to and from ships and barges. For a fee, the terminal provides various services including line handling, cargo stevedoring, and fresh water and barge shifting. Under the terms of the lease agreement, the terminal lessee may use and operate the terminal primarily for its own business requirements as well as those of its subsidiaries. To the extent the terminal is not required for the lessee’s business purposes, it is available for use by others “without undue discrimination.” The current lessee of the Burnside terminal is defendant, Ormet Corporation (hereinafter, “Ormet”), an assignee of Olin *1123 Matheson.[1] Ormet also operates an adjoining alumina plant.
Approximately fifteen ships a month call at the Burnside terminal. Generally, each of these ships require two or more tugs to assist them from the middle of the river to a berth at the dock, and a similar number upon their departure. Traditionally, the selection of a tug company was left to the ship’s owner or his agent. Due to the highly competitive market for tug services, it was not uncommon for a ship owner or agent to obtain, through negotiation, a discounted rate 13from the tug company’s published tariff rates. The ship or its charterer would thereafter be billed directly by the tug company, who would generally extend credit terms of sixty days or more. Four tug companies, namely, plaintiff-appellants, Crescent Towing & Salvage Co., Inc. (hereinafter, “Crescent”) and E.N. Bisso & Son, Inc. (hereinafter, “ENB”); intervenor-appellant, River Parishes Company, Inc. (hereinafter, “RivCo”); and defendant-appellee, Bisso Towboat Co. (hereinafter, “Bisso.”) heretofore competed for the business of docking and undocking ships calling at the Burnside terminal.
The present dispute arose when Ormet, the present lessee of the Burnside terminal, in a letter to ship owners and agents dated April 19, 1995, advised that effective May 1, 1995, all vessels calling at the Burnside terminal must arrange to use its tug service when docking, undocking or performing any other activity requiring tug service. Because Ormet does not own any tugs, it entered into a “non-exclusive” contract[2] with Bisso to provide tug services to ships calling at the Burnside terminal.
Under the system implemented by Ormet, Ormet books the tug service directly with the ship owner or his agent, and retains for itself a portion of the non-negotiable tug fee. Additionally, Ormet now bills for tug services in advance. As a result of this contract, Bisso, which by its own admission, previously enjoyed only 20-25% of the tug service at Burnside, has dramatically increased its share of the market through the exclusion of its competitors. Bisso now bills Ormet directly for the tug services rendered, and receives payment within forty-five days.
After implementation of the contract and approximately one month before plaintiff-appellants instituted the present action, representatives of Crescent, ENB and RivCo, together with a representative of the New Orleans Steamship Association, presented their objections and arguments at a meeting of the Executive Committee of the Port Commission. A representative of Ormet was also present and explained the company’s contract with Bisso. The commission, after seeking the advice of its counsel, decided that Ormet was not in violation of its lease, and decided to table further consideration of the issues.
JjACTION OF THE DISTRICT COURT
Crescent and ENB filed this action for injunctive relief alleging that Ormet’s contractual relationship with Bisso has deprived them of access to Burnside’s public terminal, and caused them irreparable harm including the loss of customers, profit and goodwill. Through a subsequently filed intervention, RivCo joined with Crescent and ENB in their effort to have Ormet’s contract with Bisso declared illegal and contrary to public policy. Following a three day hearing, the district court, while expressing concern over what it found to be “about as exclusive an arrangement as I can imagine,” declined to issue a preliminary injunction. Following the denial of their request for a preliminary injunction, the parties stipulated to the entry of a judgment as to plaintiff-appellants’ entitlement to permanent injunctive relief based upon the transcript and other testimony adduced at the preliminary injunction hearing. The request for a permanent injunction was denied. From these judgments, plaintiffs *1124 and intervenor (hereinafter collectively referred to as “appellants”) have appealed.[3]
ISSUES RAISED ON APPEAL
On appeal, appellants argue that the district court erred in the following respects:
1. In holding that, as a matter of law, Bisso was not a “carrier” within the meaning of La. R.S. 34:1223(E), which prohibits the grant of exclusive franchises to “carriers;”
2. In holding that the Port Commission had not impermissibly delegated its authority to Ormet;
3. In holding that the exclusive franchise did not violate state and federal navigational servitudes;
4. In concluding, as a matter of law, that the Burnside terminal is not a “public utility” that is prohibited from tying the unrelated terminal and harbor tug services together;
5. In concluding, as a matter of law, that the exclusive franchise granted by Or-met to Bisso with the Port Commission’s tacit approval did not violate the federal Commerce Clause.
DISCUSSION

1. Is Bisso A Carrier?

| sin their first assignment of error, appellants assert that the trial court erred in failing to hold that Bisso was a carrier within the meaning of La. R.S. 34:1223(E). That statute, which relates to the rights and powers of the Port Commission, provides:
E. The commission shall have authority to make and enter into contracts, leases and other agreements with railroads, trucking companies, barge lines and with any and all companies interested in the transportation, storage and shipping of goods and other products, whether by rail, truck line, barge line, ocean going vessels or otherwise for the use of facilities administered by the commission or any part or portion thereof, for a period of time not exceeding forty years. No exclusive franchise, however, shall be granted to any carrier, (emphasis supplied).
Appellants assert that tugs assisting ships at the Burnside terminal are carriers in that they help transport shipboard cargo from the navigable channel of the Mississippi River to the dock. For this reason, Ormet’s exclusive use of Bisso tugs at the Burnside terminal violates the provisions of the above-quoted statute. Appellants argue that because ships lack the lateral propulsion necessary for docking operations, tugs, when they are assisting ships, become an essential part of the ship’s navigational system, and essentially, the two vessels become “one unit at that point.” Appellants further argue that when ships approach the terminal, they are more akin to unpowered barges, and that hence, the tugs become carriers.
In response to this argument, appellees assert that La. R.S. 34:1223(E) makes it clear that the carriers described in this statute are only those that transport cargo. Appellees argue that the above-quoted language of that section sets forth the traditional types of carriers, i.e., those that transport cargo from one place to another, and it is these entities to which the statute refers when it states that “[n]o exclusive franchise may be granted to any carrier.”
The statute, as interpreted by appellees, would permit the Port Commission to enter into agreements with traditional carriers as well as those companies such as Ormet who are “interested” in the transportation, storage and shipping of goods; however, the Commission would be specifically precluded from entering into exclusive agreements with traditional carriers. Appellees assert that the legislative purpose behind such a distinction was to insure that carriers who bring cargo to the port do not also control the port’s terminals.
*1125 As the district court observed in its reasons for judgment, La. R.S. 34:1223(E) does not define the term “carrier.” While we can find no cases or other authority which would be | (¡dispositive of the question of whether a harbor tug is indeed a carrier, we note that the term “carrier” generally refers to one who undertakes the transportation of persons or property, or one employed in or engaged in the business of carrying goods for others for hire. Black’s Law Dictionary, 269 (4th ed.1957). Similarly, in Higginbotham v. Public Belt Railroad Commission, 181 So. 65, 69 (Orl.App.1938), affirmed, 192 La. 525, 188 So. 395 (1938), the court defined a “carrier” as “one who undertakes to transport persons or property from place to place.”
Earlier, in Bussey & Co. v. Mississippi Valley Transportation Company, 24 La. Ann. 165, 167 (Orl.App.1872), the court was presented with the question of whether a towboat company engaged in the shipment of goods for hire could be considered a common carrier for purposes of tort liability. The court, in its opinion in Bussey, noted that while this issue had long been settled in the affirmative in Louisiana, there existed an apparent conflict in the American jurisprudence. Attributing these conflicting views to the manner in which the towboat was employed, the court went on to distinguish the instance wherein a towboat is “employed as a mere means of locomotion under the entire control of the towed vessel” with the owner of the towed vessel never relinquishing possession and control of the property transported, from the very different situation in which a towboat plies regularly between fixed termini, and indiscriminately tows for hire barges laden with goods which are placed under the towboat’s full possession and control. The court in Bussey concluded that the ease before it was analogous to the latter situation, which “seem[ed] to satisfy every requirement in the definition of a common carrier.” Bussey & Co. v. Mississippi Valley Transportation Company, 24 La. Ann. at 167.
Upon consideration of the foregoing authorities and a review of the record in this matter, it is clear that a ship attempting to enter or leave a marine terminal differs from a barge in that the ship has a rudder, engines, a pilot, a master and a crew. Consequently, tugs do not exercise the same dominion over a ship as they would a barge. Moreover, the accompanying tugs never assume full direction and control over said vessel’s cargo, and for this reason, said tugs cannot be considered “carriers” within the meaning of La. R.S. 34:1223(E).
While there can be no dispute that the assistance provided by said tugs is vitally important to the pick-up and delivery of goods, such duties are merely incidental to those of the vessel which is the actual carrier.
UBased upon our review of the testimony contained in the record before us, it is clear that the tugs operating at the Burnside terminal take their directions from the master of the vessel and his pilot who retain ultimate control over the vessel and its cargo. For these reasons, this assignment of error is without merit.

2. Did The Port Commission Impermissi-bly Delegate Its Regulatory Authority To Ormet?

Appellants assert in their second assignment of error that in consenting to the addition of Addendum No. 8 to its terminal lease with Ormet, the Port Commission had imper-missibly delegated both its regulatory oversight and its limited authority to enter into exclusive franchises.
The record reflects that effective January 1, 1992, the Port Commission and its lessee, Ormet, executed Addendum No. 8 to its original marine terminal lease. Said Addendum No. 8 deleted the previously existing provision that all rules, regulations, tariffs, rates and charges established by Ormet were subject to review and approval by the Port Commission.
In connection with this assignment of error, appellants argue that the addendum grants to Ormet the unfettered authority to promulgate rules and tariffs for the Burnside terminal solely in its own interest without regulatory oversight. Appellants further argue that the Port Commission cannot constitutionally delegate its regulatory oversight *1126 authority or its limited power to enter into exclusive franchises.
With regard to the power of the Port Commission to enter into exclusive franchises, both appellants and appellees cite the case of Greater Baton Rouge Port Commission v. Cargill Incorporated, 252 La. 718, 214 So.2d 119 (1968) for the proposition that “a public body has no power to grant an exclusive franchise to private corporations, unless such power has been delegated to it either expressly or by necessary implication under the legislative act.” Cargill, 214 So.2d at 124. In Cargill, the Louisiana Supreme Court addressed the question of whether plaintiff had granted to defendant, a grain company, an exclusive franchise to operate all public grain elevators within the Port of Baton Rouge. In reaching its decision, the court turned to Section 29 of Article VI of the Louisiana Constitution of 1921 which created the Port Commission, and cited with emphasis the following language:
‘The Commission shall have the authority to make and enter into contracts, leases and other agreements with railroads, trucking companies, barge lines and with any and all companies interested Rin the transportation; storage and shipping of goods and other products, whether by rail, truck line, barge line, ocean going vessels or otherwise for the use of facilities administered by the Commission or any part of [sic] portion thereof, for a period of time not exceeding forty (40) years. No exclusive franchise, however shall be granted to any carrier.’
Greater Baton Rouge Port Commission v. Cargill Incorporated, 214 So.2d at 125. (emphasis supplied therein).
The court in Cargill ultimately concluded that:
[t]he above quoted constitutional grant of power vested in the Commission to enter into contracts, leases and other agreements necessarily includes by implication the authority to grant exclusive privileges in order to carry out the scheme for the development of the Port of Baton Rouge. Indeed, this is made evident by the last sentence of the provision declaring: ‘No exclusive franchise, however, shall be granted to any carrier.’ This language ... indicates the intent of the lawmakers that in all other instances, save those involving contracts with carriers, the Port Commission has authority to grant exclusive franchises, rights and privileges.
Greater Baton Rouge Port Commission v. Cargill Incorporated, 214 So.2d at 125.
In its brief to this court, the Port Commission asserts that the supreme court’s holding in Cargill is similarly applicable to the present ease. We agree.
In accordance with Article XIV, § 19 of the Louisiana Constitution of 1974[4], the above-cited provision from the Louisiana Constitution of 1921 was retained and later enacted as La. R.S. 34:1223(E). By virtue of the authority granted to it by R.S. 34:1223(E), the Port Commission was acting within the law when it granted an exclusive contract to Ormet for the operation of the Burnside Terminal. Additionally, and inasmuch as we have previously determined that Bisso was not a “carrier,” we must conclude that the Port Commission itself could have similarly granted an exclusive contract to Bisso to provide tug service at said terminal. Therefore, the fact that such a contract, exclusive or otherwise, was granted to Bisso by the Port Commission’s lessee, Ormet, rather than by the Port Commission itself, appears to be a distinction without a difference.
We turn now to appellants’ contention that the Port Commission, through its execution of Addendum No. 8 of the lease agreement, impermissibly delegated its oversight authority to review and approve all rules, regulations, tariffs, rates and charges established by Ormet. In our |9review of this matter, we note that appellants have failed to cite any applicable authority for the propbsition that the Port Commission is charged with the duty to review and approve the rules, regulations, tariffs, rates and charges established by its lessee. While the Port *1127 Commission is required by La. R.S. 34:1223(C) to regulate commerce and traffic within the area it serves in a manner consistent with the best interest of the state, we do not believe said statute can be extended to impose upon the Port Commission such oversight measures as it may have once deemed prudent to place in its lease. Absent some showing that its decision to discontinue reviewing and approving the rules and charges of its lessee was inconsistent with its obligation to act in the best interest of the state, we cannot say that the Port Commission impermissibly delegated its oversight authority.
Accordingly, this assignment is without merit.

3. Does Omnet’s Contract With Bisso Violate State And Federal Navigational Servitudes?

In their third assignment of error, appellants contend that state and federal navigational servitudes prevent Ormet or the Port Commission from interfering with or restricting the public’s right to use the Mississippi River as a highway of commerce. Appellants cite La. Civ.Code art. 452 for the proposition that a river user has the right to “moor ships ... provided that he does not cause injury to the property pf adjoining owners.” Appellants further argue that Or-met’s contract with Bisso violates state and federal navigational servitudes because it eliminates appellants’ right to moor ships at the Burnside terminal thereby creating an “exclusionary zone” around the Burnside terminal.
It is clear from the language of La. Civ. Code art. 450[5] that the water of a navigable river is a public thing subject to public use. Additionally, article 456 provides that the banks of Innavigable rivers and streams are private things subject to public use. See 2 A.N. Yiannopoulos, Louisiana Civil Law Treatise — Property § 74 (3rd ed.1991).
In his treatise on Louisiana property law, Professor Yiannopoulos observes that:
[pjublic use is generally regarded in Louisiana as a charge in the interest of the public akin to a servitude. It is neither a predial nor a personal servitude, but a sui generis burden, which confers on administrative authorities and courts broad powers for the regulation and protection of the rights of the public.
2 A.N. Yiannopoulos, Louisiana Civil Law Treatise — Property § 82 p. 167 (3rd ed.1991) (footnotes omitted).
Additionally, La. Civ.Code art. 460 provides in pertinent part:
Port commissions of the state, ... may, within the limits of their respective jurisdictions, construct and maintain on public places, in beds of natural navigable water bodies, and on their banks and shores, works necessary for public utility, including buildings, wharves, and other facilities for the mooring of vessels and the loading or discharging of cargo and passengers.
Based upon our reading of the record in this matter, it is clear that the public’s right to navigate and utilize the Mississippi River as a highway of commerce has not been physically obstructed. It is also evident that neither Ormet nor the Port Commission has denied the public access to the Burnside terminal. Admittedly, Ormet’s contract with Bisso has denied appellants the right to solicit business at the Burnside terminal; however, navigational servitudes protect the public’s right to utilize the river and the bank for navigation and commerce, not the business relationships of private business interests.
For the foregoing reasons, we conclude that this assignment of error is without merit.

4.. Is The Burnside Terminal A Public Utility?

In their fourth assignment of error, appellants claim that the district court erred *1128 when it concluded that the Burnside terminal was not a “public utility” that is prohibited from tying together unrelated terminal and harbor tug services.
To support their claim that the Burnside terminal is a public utility, appellants cite Morehouse Natural Gas Co., Inc. v. Louisiana Public Service Commission, 242 La. 985, 140 So.2d 646, 651 (1962), for its definition of a public utility, i.e. “a business organization which regularly supplies the public with some commodity or service”. Claiming that the “Burnside Terminal easily fits this definition”, appellants go on to analogize the facts of the instant case tojnthose presented in Hicks v. City of Monroe Utilities Commission, 237 La. 848,112 So.2d 635 (1959).
In Hicks, the City of Monroe sought to charge a higher rate for water to customers located outside of the city limits who took water service only, than it charged to similarly situated customers who took both water and electric power. The supreme court, in affirming the appellate court, quoted from the appellate court opinion and held that “a public utility, whether privately or municipally operated, has no right to condition its service or its rates upon collateral matters not connected with the furnishing of the particular service involved.” Hicks v. City of Monroe Utilities Commission, 112 So.2d at 652. Appellants argue that like the water utility in Hicks, Ormet is attempting to tie its core service (ship loading and unloading) to an unrelated service (harbor tug service).
Appellants’ argument fails in that appellants have not shown that a marine terminal, like the one Ormet operates at Burnside, is a public utility under Louisiana law. Moreover, appellants have conveniently ignored the statutory definition of “public utility” set forth in La. R.S. 45:1161. That statute provides in pertinent part that a “public utility” refers to:
any person, public or private, subject to the general jurisdiction of the [Louisiana Public Service] commission but not including carriers by rail, water, electric or motor vehicles or pipelines, or public utilities municipally owned, or operated, or regulated, unless the electors of such municipality, and electors residing outside the municipality, who are customers of the municipally owned utility, have manifested their approval of such jurisdiction as is required by Article IV, Section 21(C) of the Constitution of Louisiana in the manner provided by R.S. 45:1164.1 through 45:1164.13.
Additionally, R.S. 45:1163 provides that the Public Service Commission “shall exercise all necessary power and authority over any street railway, gas, electric light, heat, power, waterworks, or other local public utility” for the purpose of regulating the rates and services provided by said public utilities.
It should also be noted that throughout its many sections, Title 45 of the Louisiana Revised Statutes lists the various public utilities and carriers. Such entities include: airplanes, canals, electricity, motor carriers, pipe lines, railroads, street railroads, telegraphs and telephones, radio and television, and news media. See La. R.S. 45:1-1504. Nowhere in Title 45 are marine terminals and/or tugs mentioned in reference to either a public utility or a carrier.
| laAbsent some authority to show that the Burnside terminal qualifies as a public utility under the laws of this state, we cannot say that Ormet impermissibly “tied” together unrelated services. For this reason, this assignment of error is without merit.

5. Do Ormet’s Actions Violate The Commerce Clause?

In their fifth and final assignment of error, appellants claim that Ormet’s anti-competitive tug contract with Bisso unduly burdens and discriminates against interstate commerce in violation of the United States Constitution. Appellants argue that the removal of competition among tug companies at the Burnside terminal has resulted in artificially high fees for tugs sendees thereby imposing higher costs on shipping interests without any corresponding benefit.
In support of their Commerce Clause argument, appellants rely primarily upon C & A Carbone, Inc. v. Town of Clarkstown, New York, 511 U.S. 383, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994). In Carbone, the Supreme Court was asked to consider a Clarks-town, New York ordinance which required *1129 that all nonhazardous solid waste generated or brought into the town be deposited at a transfer station built and operated by a designated private contractor for sorting and eventual disposal. While the avowed purpose of the ordinance was to prevent garbage from entering the stream of commerce until it had been properly treated, the effect was to prevent everyone but the favored local operator from performing the initial processing step. In striking down the ordinance, the Court held that it violated the implied provisions of the commerce clause by hoarding solid waste, and the demand to get rid of it, for the benefit of the preferred processing facility.
The instant case can be distinguished from the facts presented in Carbone, because Or-met’s policy of requiring vessels which call at its terminal to utilize its tug services does not regulate or impede the free flow of commerce passing through the terminal, but rather, seeks to facilitate and improve the overall efficiency and profitability of terminal operations. This is achieved by avoiding the potential for costly delays in tug assistance, and reducing the risk of damage to vessels and the terminal itself through the use of regular tug crews who are intimately familiar with the particular river currents and eddies which may be encountered by vessels entering or leaving the dock.
While there can be no doubt that tug policy adopted by Ormet results in a nominal increase in shipping costs, it is the opinion of this court that its effects on interstate commerce are | ^merely incidental. Because said policy has been applied in an even-handed manner to all vessels calling at the Burnside terminal, we believe the overall benefits to both shippers and the terminal cannot be held to violate the dormant provisions of the commerce clause. We must conclude that this assignment of error is also without merit.
CONCLUSION
For the reasons set forth above, the judgment of the district court denying the request by plaintiff-appellants, Crescent Towing & Salvage Co., Inc. and E.N. Bisso & Son, Inc., and intervenor-appellant, River Parishes Company, Inc., for a permanent injunction against defendant-appellees, Greater Baton Rouge Port Commission and Ormet Corporation, is hereby affirmed. All costs associated with this appeal shall be assessed against appellants, Crescent Towing & Salvage Co., Inc. and E.N. Bisso & Son, Inc.
AFFIRMED.

. The record reflects that Ormet pays the Port Commission about $300,000.00 a year in connection with its lease of the Burnside terminal.

. The contract is "non-exclusive” to the extent that Ormet is not obliged to utilize Bisso tugs, and in the event Bisso is unable to perform its duties under the contract, Ormet or Bisso may contract with other tug companies. Nevertheless, Ormet concedes that it is currently using only tugs provided by Bisso, and that vessels calling at the Burnside terminal are required to use Bisso tugs.

. Appellants in this matter have appealed both the denial of their request for a preliminary injunction as well as the court's subsequent denial of their request for a permanent injunction. Because the parties, the issues and the record are identical in both matters, our decision concerning the denial of appellants' request for a preliminary injunction, Appeal No. 96-CA-1332, simply references this opinion which addresses the denial of their request for a permanent injunction.

. Article XIV, § 19 of the Louisiana Constitution of 1974 provides in part that ”[a]ll provisions of Article VI, Section ... 29 ... of the Constitution of 1921 shall become [a statute] subject to amendment or repeal only as provided in Article VI, Section 43 of this constitution.”

. La. Civ.Code art. 450 provides:
Art. 450. Public things
Public things are owned by the state or its political subdivisions in their capacity as public persons.
Public things that belong to the state are such as the running waters, the waters and bottoms of natural navigable water bodies, the territorial sea, and the seashore.
Public things that may belong to political subdivisions of the state are such as streets and public squares.